Good morning, ladies and gentlemen. This is the time for argument in Contessa Foods v. Berdex Seafood. We understand that everyone is here, and so the appellant may proceed. Good morning, Your Honors. My name is Theodore Pianco. I'm here with Gary Dukarich and Joel I would like to reserve five minutes of my 20 minutes for rebuttal if that is okay with the Court. In this case, there are three particular areas I'd like to address. The first was whether the District Court erred in dismissing Contessa's copyright infringement claims by misconstruing the Savings Provision Clause set forth in 17 U.S.C. § 1405 and by resolving contested material fact issues on summary judgment. The second issue I would like to address is whether the District Court erred in dismissing Contessa's trademark infringement claims and related state claims by misapplying the Ninth Circuit's holding in Lindy Penn and further resolving contested material fact issues on summary judgment. The third issue I'd like to address is whether the Court erred in refusing to grant Contessa a permanent injunction based on the defendant's motion for summary judgment in this case. With respect to the copyright claims, we're concerned here with this boiling shrimp image you've seen in our papers. It was created in 1986, and therefore it's governed by the Copyright Act of 1976. The Copyright Act of 1976, as it originally acted, had a savings provision for copies that were distributed to the public without notice. That particular savings provision was amended by the Berne Convention Implementation Act of 1988. The rest of the world, because the United States had always been very particular about requiring that there be a mandatory notice of copyright on a work or else you could lose your right to the copyrights. Section 405 was the savings provision, and there was only one change made to it as a result of the Berne Convention Implementation Act. Its preamble was changed to replace the language, the omission of the copyright notice prescribed by, and then referred to sections 401 through 403 which required it, was replaced with only the language, with respect to copies and phonorecords publicly distributed by authority of the copyright owner before the effective date of the Berne Convention Implementation Act of 1988, the omission of the copyright notice described in, and then it continued. And underneath, there were three provisions that a copyright owner could use to save the copyright in the event that copies went out without notice. Those were not changed at all. In this case, contestants were relying on the first one, that the notice has been omitted from no more than a relatively small number of copies or phonorecords distributed to the public. Well, now, if I understand it, the real issue is relative to what? That is, what is the universe of? Yes, Your Honor. And the district court construed this change to Section 405 to make the universe restricted to just copies published prior to March 1, 1989, which was the effective date of the amendment. And we believe that that misconstrues the change and is at odds with the purpose of the Berne Convention Implementation Act. So, now, what exactly do you define as the proper universe? The proper universe would be all other copies distributed to the public. To find out what period of time? To now? There are cases have dealt with this in different ways. Some cases have examined the numbers right through the time of trial. In this case, that would be 40, about 49 million copies as of... Well, but that's a lot. The convention went into effect quite a while ago. It did. Absolutely. It's unlikely that a 15-plus year period is the period that we should be looking at. What should be the period we're looking at? You have other options. One is the time... What do you say we should do? You're writing our opinion for us right now. If I was sitting in your chairs, I would pick the time of the infringement. Because in this particular case, that's what's fair. The defendants here could claim that the in this case, there is evidence in the record that there were tens of millions of copies with notice that had been published to the world at the time the infringement started. And here the infringement starts in the 1997, 1998 time period. So through this whole course of events, I think the court has to look and decide what's fair under the circumstances. And here, I believe, would be the time of the infringement. In any event... Does that essentially give a free ride to someone who didn't put the registration, the right mark before the Berne Convention went into effect? No. It gives them exactly the same ride they had before because the statute hasn't changed in that regard. You still look at the same thing, whether they're relatively small compared to the number of properly noticed copies. Nothing has changed by the Berne Convention. We believe the judge's decision to draw a bright line and say, as of that date, you're now worse off as a copyright owner than you were before because we're limiting the scope of properly noticed copies we can compare to, to determine whether the unnoticed copies are relatively small. So in fact, the district court's interpreting this in a way that is very prejudicial to copyright owners and is at odds with the purpose of the Berne Convention Implementation Act, which eliminated the mandatory need to have a notice. Does that mean you could have, for different allegedly infringing parties, different determinations of whether or not the right had lapsed or had been forfeited for failure to give proper notice? I mean, suppose, in this case, the litigation starts and so forth, and it turns out somebody else had infringed five years earlier. Do you look at a different notice for that person? No, I don't think you would. I think there would be collateral estoppel and re-judicata. Once the copyright becomes invalid, it's invalid. But it's not tested until the first time it comes up. And here, I think the court has to deal with the situation they're in. When are we testing it, and what's fair to do? When do you claim that copyright came into its maturity as a valid copyright? I believe, Your Honor, the copyright starts out as valid. And you can lose it. Well, if you use something, it has a kind of an end quote possibility, and then you have to do something, don't you? Eventually, you can seek to make a registration of the copyright if you wish to enforce it. And in this case, there was a registration in 1994, and that is a precondition to enforcement. But it's not required in order for the copyright itself to be valid. As long as you – at least in the Copyright Act of 1976, as long as you sent out enough properly noticed copies, your copyright was valid. But are there any cases that we can use to measure when is a sufficiently broadcast notice? When does the notice start to take effect? How many times does this inchoate thing have to float out there and get picked up by some member of the public before it is noticed? Your Honor, the statute itself doesn't provide much of a guideline. It talks about relatively small, and compared to Shaquille O'Neal, I'm relatively small. The cases that have considered it have dealt with situations where there were 4 million copies, say, in the Ford case we've cited. In other cases, they deal with much smaller numbers. But it's all – I think the focus has to be on relatively small under the circumstances of that particular case. And there's no bright lines other than the language of the statute to provide that guidance. Help me again. The district court – there were two magazine ads? Was that – Two magazines had ads in them prior to March 1 of 1989. They did not have the – They did not have a copyright notice on them. The notice. And how much was there that did? During that time period, there is a range of evidence. But it could be as many as about 900,000, or it could be less than 500,000, somewhere in that range. So even then, we believe the court picked a number of 144,000. And, you know, that's getting close to what's relatively small. But I don't think it's fair to cut off the counting as of March 1, 1989, because I don't believe the statute provides for that. And under the circumstances here, it's unreasonable. Well, let's try another alternative, then. I understand the argument saying the effective date of the other statute really is sort of an irrelevant event in terms of the facts of this case. But one alternative would be the time of the discovery of the omission. Because Section 405 really says, okay, if you've discovered – you've got this omission, you can overcome it through these three ways. Now, one of them includes registration, but that option wasn't chosen. Presumably, your client has to count on the first of the three and defines relatively small. But why wouldn't it be relatively small based on the universe that existed at the time of the discovery that, oops, we left it off here, we've got to do something about that? Because that sounds like it's a date pretty close to what the district court makes its calculations on, just by the coincidence of dates. Oh, I don't think it is, Your Honor. There is absolutely no evidence in the record that the omission was discovered as of that time. In fact, I think the record that we have, it's not really poised for this court because that's not the basis on which the district court acted. But until the infringement came up and people started lawsuits here, I don't think anyone really discovered the omission. Now, discovery in this area is sort of a term of art. It's not just, you know, sending out something and seeing it doesn't have a notice on it. It's got to be something more than that, realizing that you've made a mistake. And in this case, we really don't have any evidence in the record to serve as a basis for drawing a cutoff. And I certainly don't believe it's March 1, 1989. I recall, and I have to concede that the record here is voluminous and my review of it has been less substantial than probably anybody else sitting on that side of the bench. I recall something like dissatisfaction with the ad agency and them being replaced by somebody else. And I guess my sense or inference was that part of the dissatisfaction had to do with the failure to protect this photograph. I take it you're saying. No, Your Honor. There was another, one of the savings clause, section 405, also has a savings provision that says that the notice is omitted in violation of express written directions by the copyright owner. And that particular defense was explored at length. But at this point in time, we didn't have a written contract with the advertising agency that was specific enough to allow us to come under that provision. But that's why you've seen that noise in the record. In any event, Your Honor, we believe that the in fact the court erred both in construing the statute and basically conducted a trial on its own by determining what the alleged number of unpublished copies are based on incompetent evidence. And under the circumstances, this particular these particular copyright claims should be sent back to the district court to be litigated. The next subject I wanted to address real quickly are the trademark claims. The most relevant case here is the Ninth Circuit's decision in Lindy Penn. And Lindy Penn was a case where, which dealt with whether a copy, a trademark owner could recover the profits from the infringer. In Lindy Penn, the, there was an express finding by the district court that the trademark infringement was not intentional. And the Lindy Penn court was looking to apply a willfulness standard to determine whether profits should be disgorged by the infringers. That that willfulness standard was somewhere between negligence and this intentional infringement. We believe, and the language of the Lindy Penn case requires that standard for willfulness to be a connection between a defendant's awareness of its competitors and its actions at the competitor's expense. In Lindy Penn, the plaintiff was a very small declining company that had a trademark that had really fallen in decline and their business had fallen in decline. On the other hand, we had the Big Pen Company, which was a very big growing company, and they happened to use the term auditors on a pen and Lindy Penn had asserted trademark rights over the word auditors used on a pen. In the Ninth Circuit's review of the facts there, it was kind of like a reverse confusion type case. The court found, well, there's no willfulness here because Lindy Penn's really got, I mean, BIC's got nothing to gain by copying this mark. The people that worked at BIC didn't know it was Lindy's mark. Lindy's a small company. There's just not any evidence from which a jury could find that BIC intended to profit somehow on the trademark of Lindy Penn. Our case is different. The evidence in the record is that Contessa is one of the leading distributors of shrimp. The record also shows that Contessa has an extensive and very successful marketing campaign and that the defendants were aware of it. They saw the ads. There were millions of them. They went to seafood shows where the boiling shrimp image, which is Contessa's signature source identifier, was displayed. They were aware of Contessa. Some of them had even been engaged in litigation in the past with Contessa. What they weren't so aware of is that Lockberg, who was surely trying to copy an image, was sticking this image on packages within the master cartons, and the evidence, as I've looked at it, there are references from here and there saying that there were people among the current defendants, excluding Lockberg, who may have been aware of the packaging. But it's hard to make out a case, it seems to me, that these defendants were trying affirmatively to use that or, in some cases, were aware of it other than through the fact that some of their employees opened up the boxes. Your Honor, when you get a chance to look closer at the record, you'll see that, in fact, the quantum of evidence on the issue varies by defendant. There are some, like Burdick's, where the Lockberg people came to the Boston Seafood Show and showed them the packaging and said, this is what we're going to start using now. And it was approved. Burdick's ordered products. And we think, under the circumstances, a jury could reasonably conclude from that evidence that Burdick's acted willfully. There is another defendant, Mazzetta Company. Thomas Mazzetta was aware of us. And at the time, he became aware of the infringement. He knew that he had this product in his warehouse from Lockberg. And yet he didn't direct anybody to go inspect the warehouse to find out whether, in fact, they had the infringing stuff. He just kept selling it because, as he testified in his deposition, it was just a small item to him. It didn't matter. It's that kind of evidence, we believe, that would justify a jury and reasonably concluded that these defendants acted with enough willfulness to justify a profit's disgorgement in this case. Similarly, other defendants were constantly handling these boxes. And there's evidence in the record as to that. And there's also evidence that these defendants, that these individuals, knew about contests and its marks. So under the circumstances, Your Honors, I believe that it may be different by defendant, but as to a large number of the defendants, there's enough evidence from which a jury could reasonably conclude that there was enough willfulness, that profit's disgorgement is appropriate. And we believe the district court's summary judgment should be reversed. On the injunction, I'm sort of running out of time. I'll save my last two minutes. But I think that our argument on that relates to your determination on the willfulness issues and the evidence that's before the Court. Thank you. Thank you. May it please the Court, my name is David Lieberworth. I represent Hanwha American Corporation. And I am going to be one of a series of lawyers speaking here. And we have divided up the time amongst us. So I will try to truncate my arguments, but I will introduce what we are going to do by a lawyer who's going to argue them briefly. I am going to lead off and spend seven minutes, or I hope less, arguing the copyright issues. And I will demonstrate, I hope, that any Contessa copyright in the Boiling Shrimp image was abandoned to the public domain by its failure to timely affix a proper copyright notice before publishing a not insubstantial number of copies. At that point, I will sit down. And Jeff Miller for Fishery Products, sometimes referred to as FPI, will spend about five minutes demonstrating that there was no admissible evidence to support Contessa's argument of willful infringement of the Boiling Shrimp trademark. At that point, Nina Schultz for Burdick's will spend five minutes or so demonstrating that the district court correctly denied any request for injunctive relief on mootness grounds, and because there was unrebutted evidence that all of the defendants had stopped dealing with Lockport, the only proven infringer, as soon as they were on notice of Contessa's claims. And finally, last but not least, Mr. Galenka for Mazzetta will spend our final minutes demonstrating A, that Contessa failed to meet its burden of showing with admissible evidence the actual use, the actual infringement by any of these parties, or at least most of them, which should require dismissal of all of the claims copyright or trademark, because then there's simply no infringement. And also that Contessa's persistent and, we believe, abusive pursuit of its doomed copyright claims should have caused the court to grant an award of fees. I am going to address some of the questions out of the box that the court asked of opposing counsel to start with. But to do so, I would like to point out that the evidentiary record is not as simple as, or as favorable to, appellant as they would have you believe. In fact, there is essentially no evidence of any use of the copyright notice at all, or at least one that was properly dated so as to be treated as notice until 1998. And while I understand the court's concern for defining a proper time period in this case, under any view, the copyright was lost long before this case was filed. You can see that from the eight. Is there any dispute about where the mark was used without the right copyright notice? That is, these ads. There is no dispute. There's no dispute that those are the only times? No. There is, in the record, you have those, I believe, eight publications, amounting to, if one is charitable, 144,000 copies. And if one accepts the testimony of Ms. Ronai, who was the advertising person for Contessa, 240,000 copies as of the winter of 1989, and none at that point with the proper copyright notice. At that point, if you look in the record, the opponents here try to work backwards to translate from pounds into number of boxes. There is not a single box in that 1989 through 1998 time period which Contessa was able to put before the court and say, here, look, here is a properly noticed box or image, not one. And so while I understand the court's concern to divide time period in here, you could choose a range of time periods and it would lead you, ineluctably, to the same conclusion. What exactly are you saying? There's not one time when they ever used the proper mark? In 1998, Contessa was able to put forward a box, to offer into evidence a box, which had two dates on it. One date, they say, 1998, was the date when they modified the text. So that tells you when they first used that box. The other date, 1989, was what they said, and we accept for summary judgment purposes this argument, was the date of the copyright. Now, in fact, excuse me, 1988, I apologize. Now, in fact, that 1988 date is wrong. The first publication, it's undisputed, was February 1987. But for this purpose, because the statute says that if you put on a date which is not more than one year from the date of actual use, that does not create a defective date in the notice. We treat the 1998 publication as having a cup, that is to say, the box, as having the proper date and the proper notice. But that's the first time. Well, that's the first time that the evidence of the box itself, does the record contain evidence in the form of declaration, oral testimony, anything else, that says the earlier years included the photograph with the proper notice attached to it. There is testimony from, there's an affidavit declaration from Ms. Roddye. However, with respect, that testimony, A, is flatly contradicted by the boxes in question. Understandably, that creates a muddied record for summary judgment. But more important, it simply isn't admissible. She had no personal knowledge. There's no record at all of personal knowledge. So that she couldn't, she could testify, but it's like me testifying about the weather, what the weather is in Tobago. I don't have personal knowledge, and I don't have the position which would give me personal knowledge. And that is why I said there is no, I should have said no admissible evidence in the record on that point. But if you look at just the magazines for a moment, what you must say is that up through the winter of 1989, there is not a, there is no publication of the image with the copyright notice. And we would suggest that that is the proper date to measure under the effects of this case. This is not a case in which, in the, what I'll call the hypothetical horrible that you see in their brief, publication on February 28, 1989 of a single unnoticed image. This is a case where there is a long history. And the reason we suggest that that makes sense, to use February, excuse me, March 1, 1989, is because this is not the only savings provision in the statute. If this were the only one, you might be able to debate the issue of whether one should construe it one way or the other. But number one, the statute reads as though, as you should treat that period as the defining one. And second, one doesn't need 405A1 to save the copyright holder's rights. If the copyright holder would register in five years under 405A2, he or she could save his rights. And that's why that's the proper defining period. And I am concerned that I am running over, so I'm going to stop. May it please the Court. Jeffrey Miller on behalf of the Defendant and Appellee Fishery Products International Incorporated. I would like to address very quickly comments made in relation to the judge's decision in the district court to summarily adjudicate the issue of the equitable remedy of accounting of profits. I think counsel, at least from what he said here this morning, is correct that the standard in this circuit is very clear under Lindy Penn. But the key to it, I think, when we take a hard look at it from the record, is that when we're talking about Lindy Penn remedy for equitable, the remedy of accounting of profits, what we're really talking about is not an issue of compensation. It's an issue of curing an injustice. What the law is designed to do is to prevent an intentional wrongdoer from profiting from the wrongful act. And when you look at Lindy Penn and what it says, it says really two things. That the intent requirement has to have a deliberate intent to deceive, some kind of bad faith component to it, misleading or something of that nature. And second, it has to have a calculation to exploit the relative trademark that they're talking about. In other words, there has to be a benefit, something in it for the alleged infringer. That's the problem in this case. What we have here is a situation, and as Justice Clifton pointed out, the evidence disclosed is really the bad guy's law firm. And the people down the line, my client is fishery products, they were simply not aware of the incidents in this case until they were sued. As I understand it, all we have left are what, the distributors? Yes. Yes. And in this situation. Because there really is no question that the people who actually stole this picture were. That's correct. That's absolutely correct. And what we have in this situation, for an example, with fishery again, my client, there was a comment made that they were constantly handling boxes. Well, that's not true. What the evidence discloses is undisputed. For fishery, they handled 19,500 cartons, and seven or less of those cartons were open for quality control or to take a look at the product. We don't have a situation where there was notice of the infringement. And I think the big thing is, when you look at the big picture here, again, you have to say, what's in it for these people? This is a commodity that was being sold. Frozen block shrimp. They don't care about the image. To be honest with you, the image is technically irrelevant to this particular situation. And this standard in the Ninth Circuit is very clear under Lindy Penn. What counsel is trying to do here is to create really some kind of hybrid between negligence and intention. But Lindy Penn requires intention. Recklessness is not enough. Gross negligence is not enough. It has to be that requisite state of mind. What exactly is our frozen block shrimp? It's the opposite of individual shrimp. It's all put in one giant block, and it's all together, and it's just one big thing. Yes, yes. And so what we're dealing with here is a situation where the Ninth Circuit is very clear. We have a definitive standard. There's no reason to differ from that. And particularly in this case where the evidence is so clear that these are innocent parties down the road that simply did not have the knowledge that you would require. You know, if you're going to use this standard, again, an equitable standard to cure an injustice, what you need is that mental process. Are these shrimp sold to restaurants and things like that? Yes. They never get into bags. Correct. The commodity items that are sold basically to institutional types of customers. And because of that, simply put, this type of image situation we're talking about is just not relevant. To conclude, again, equity, what the Court looks at in this type of remedy is to cure an injustice. Where the plaintiff doesn't suffer any damages and the defendant receives no benefit, there's no reason for the remedy. Thank you. May it please the Court. Nina Schultz for Burdex and Coast to Coast. I will keep my comments on injunction very brief since they really weren't addressed in the opening argument. First of all, here, the willfulness aspect of injunctive relief has, of course, been addressed by Mr. Miller. The other aspects of injunctive relief, the underlying facts, which are subject to the summary judgment standard of review, are undisputed. There is no claim that anything the appellees say they did after this litigation began, after Contessa gave notice, was anything other than to stop, entirely stop, inspect their products, stop doing business with Lockport. With those undisputed facts, the Supreme, excuse me, the District Court exercises discretion. And under an abuse of discretion standard, there is really, cannot be, I think, an abuse of discretion. Clearly, Judge Manella was within her discretion. Contessa does also keep raising the idea that this Court should, in fact, grant an injunction, a permanent injunction, against appellees. The problem with that argument is that although we can all look at the picture on the Lockport packaging and say, well, it looks like a boiling shrimp, the District Court found there were tribal issues of fact as to whether there was trademark infringement in this case. The District Court also found that there, excuse me, the District Court was never presented with the question whether there was copyright infringement in this case. On the copyright issue, she never got past the point of, is this a valid copyright? So without decisions from the District Court on those points, this Court cannot grant an injunction. Thank you. May it please the Court, I'm Alan DeLinke. I represent the Mazzetta Company. And I'm going to speak about an issue that applies primarily to just a handful of the defendants, or maybe many of them, depending on how many are left in the case at the moment. The defendants, Hanwha, Mazzetta, Slade-Gordon, Admiralty, and Seaport, there's no evidence in the record that any of those businesses ever distributed any infringing packaging to anyone. The plaintiff's position throughout the case was to hypothesize of it. With respect to my client, Mazzetta, we don't dispute that Mazzetta did receive from Lockport one shipment that was seized by United States Customs. That shipment was seized. And we have no reason to believe, and no evidence in the record, more importantly, on a summary judgment motion to show that any of the other shipments contained any of the allegedly infringing packaging. So without that, the plaintiff missed a key element of its case on a summary judgment motion, that is, proof of the actual infringement as to those defendants. And as when you do what Mr. Pianco suggests, look at the defendants individually, you see that Mazzetta and the others that I mentioned, there is just no evidence. They point to evidence with respect to Mr. Mazzetta when it comes to whether he knew there was a problem out there. And certainly he did. He had a shipment that was seized. But when Mr. Mazzetta did have his people inspect, no infringing packaging was found. No infringing packaging was ever reported by any customer. And most importantly throughout the course of the case in the district court, the plaintiffs never put forward any proof that any infringing packaging moved from the defendants I've mentioned into the hands of the consuming public. Without that, there's no infringement, and the case can be decided on that basis alone. And there's further evidence in the record that Lockport used more than one kind of packaging. While there was this infringing packaging out there, there's testimony in the record from Mazzetta. There's evidence in the record from other defendants in the case that shows that Lockport used a non-infringing kind of packaging, a packaging that my client refers to as the blue and white packaging. It's a plain white box with blue lettering on it. So without the plaintiff having proved that all shipments from Lockport, they missed the key element in the logic of if all shipments from Lockport were infringing and defendants had it, well, you can assume that defendants infringed. But plaintiffs can't even prove that first if, which is they can't prove that all shipments were infringing, which leads me to the fees argument, which only applies to Mazzetta, Honlaw, and Slade-Gordon. Judge Minella applied the correct standard, but she added a new standard, which was that fees should be not nominal. And she did this without any basis at all that was in the record. The party simply asked for fees to be taxed as part of costs pursuant to the Copyright Act. And the reason for that that we argue below, and that we suggest that, Your Honors, we may add for further determination to Judge Minella, is that the copyright claim that I just discussed, that the parties actually infringed, was intertwined with all the claims throughout the course of the case. That was something that legal fees were expended on the entire case throughout the entire case. As we look at whether the copyright issue went away early, which is an argument that the plaintiffs raised, that's certainly not true, because you will see in each of the summary judgment rulings that Judge Minella was forced to rule on it once again because the plaintiffs persisted in their copyright claim. They didn't drop the copyright claim. They didn't even acknowledge her earlier ruling. They tried to get the district court to rule separately on the copyright claim as to each party. And that's why Your Honors should remand as to Mazzetta, Honlaw, and Slade for determination of fees under the Copyright Act. Thank you. Thank you. Your Honors, I want to hit three points in the two minutes I have left. The first has to do with the date on the bags. There's no evidence at all that there are any bags of shrimp that didn't have a copyright notice. Every bag that's in the record does. There's evidence in the record of a bag with a 1987 copyright notice. There's a declaration about bags having a 1988 copyright notice, but those bags were lost. There's a bag that has a 1989 copyright notice that was put before the court, and then there's this other bag that has both the 1998 and the 1988. Pursuant to the same section which gives you the year leeway, which is Section 401B2, there is actually no requirement that the proper year be put on a copyright notice on a pictorial work put on any useful articles, which is what a bag is. So even if the dates were wrong, it would be inconsequential and the notices would still be good. The second point is with respect to willfulness. Here we've got someone who pirated Contessa's signature image. They did it for a reason. Well, the pirate is in Bangladesh. They are in Bangladesh. And the problem here is when the defendants receive these pirated goods, see them, they unfortunately are stuck with the responsibility of not distributing. They have to deal with their guy in Bangladesh and say, hey, these are no good. You need to fix this. This belongs to Contessa. And by going ahead and selling these things, they know they're trading off Contessa's goodwill, and that is the intent that's required under Lindy Penn. And so ‑‑ Can I ask you a question? Yes, Your Honor. Regarding the copyright and the district courts finding the conclusion that it had been abandoned. Yes, Your Honor. What is the race judicata effect of that in terms of ‑‑ or collateral estoppel in terms of the validity of the copyright for other litigation? It's bad. We've lost it. We no longer will have a copyright if this case is affirmed. Third point, Your Honors. On the alleged absence of evidence of infringement. The evidence in the record is at the 1987 seafood show, the guy from Bangladesh showed the box to Mr. Berger. He said, this is our new box. This is what we're using. Evidence in the record is there was tons of the shrimp discovered in their possession. They're claiming there was some other blue boxes. That's an issue of fact. Counsel, you have Easter time. Thank you, Your Honor. Thank you. The case, as argued, is submitted for decisions. That concludes the Court's calendar for this morning, and the Court stands adjourned. All rise. We hope that this has been helpful.
judges: Schroeder, Gould, Clifton